The first case this morning is N. Ray Kubin. Ms. Rudolph? Good morning, Your Honors. May it please the Court. The Board focused wrongly, its obvious analysis, on isolating male cDNA, the methodology of isolating male cDNA, and went down the claim language as a whole. And if it had done that, it would have seen that the claim is reciting an isolated gene fragment that's reciting specific novel DNA structures, structures that had not been identified or suggested in the analysis. If I use the O'Farrell standard, reasonable expectation of success, don't I come out with the office? No, Your Honor, for two reasons. First, in the O'Farrell standard, if you look for... And that precedes Dual, doesn't it? I'm sorry? And that precedes Dual, doesn't it? Yes, O'Farrell is... So it's the binding standard for biotech? It is a standard for biotech, that's correct. So I can use that interchangeably with Dual, and if I find a reasonable expectation of That would be correct, but you wouldn't find it in this case. The O'Farrell standard had two parts to it, and one of them was to, you know, it's obvious to try, if you vary all possible parameters, and there's numerous choices and there's no direction as to which direction or which choice would lead you to the promised land, the claimed subject matter. That certainly is the case with respect to cD48 binding. This art was extremely unpredictable, the art of NK cell biology... May I ask you a question, and I preface it with my comment that I have no scientific background, so I hope in answer to it you'll be able to state it in a way that I can understand. What were these two people trying to do? I mean, they did this, they started this work, what were they trying to discover, what were they trying to accomplish? Can you tell me in simple language that I can understand what they were seeking to do? There's certain cells in the body called NK cells that can turn on and become basically killer cells, that's where the term NK comes from. So they can destroy other cells, and the question is, what is that switch? What turns on an NK cell to become a normal resting cell, or from a normal resting cell to become a cytotoxic cell? So what they were looking at was, how does that work? What is the molecular basis and ultimately the genetic basis for that type of activation event? And that's really... And Valiente taught P38, which is NAIL, right? Valiente, what Valiente showed was a band on a gel, they have, what they did was they took the protein contents and ran it on a gel, which separates proteins... No, no, you're talking process to me, and frankly the only difference between the Valiente process and the Kubin process is the difference between a liquid immunoabsorption technique and a solid immunoabsorption technique, but we're not talking processes anyway, are we? We're talking... The P38 is NAIL, isn't it? P38, we're not contesting that P38 is NAIL, we are contesting whether... So the prior art teaches what is claimed here, and you're trying to say, but they got there a different way. No, your honor, with all due respect, the prior art did not teach what's claimed here. What's claimed here are nucleotide sequences that bind, not all of NAIL, or that encode, sorry, not all of NAIL, but a specific fragment that identifies a binding gene. You're right, they actually claim the probe that binds to NAIL, but once you've got the probe that binds to NAIL and the method easily for producing the sequence, why hasn't the prior art shown a reasonable expectation that they get to everything you claimed very quickly? Well, what they claimed was the gene fragment encoding NAIL, but not all of NAIL, just a particular... Yeah, they claimed that, but remember, they taught P38, which is NAIL. They taught... They claimed, they were smart, they claimed the probe. The probe is what's of value anyway, so that's what you claim. But they taught P38, which is NAIL. They taught only, they did not teach P38 in the sense of giving any information to identify... No, they didn't give it sequence, but again, that's where you can use the commonly used methods that anyone of skill in the art knows to get the sequence, and the only difference between the way they got the sequence and you got the sequence is the difference between the liquid and the solid immunoabsorption technique. Well, first of all, Valiente didn't get a sequence. But you're not claiming a product by process, so that difference doesn't make any difference, and we get to an obviousness. No, because there is no reasonable expectation of success, because there's things that are missing in Valiente. First is the NK cell library that's used. Valiente does not disclose the starting materials. And what does Matthew teach us? Matthew teaches that when you use a conventional method of trying to isolate this gene, it did not work. And what they used was an NK cell library from total RNA from NK cells, and that did not work. That's Sandbrook. No, that's Matthew. Well, no, but we get the library out of Sandbrook. That's why they cite that as part. Matthew is kind of a reinforcing reference that shows that they did do everything you said they haven't done in the murine context, which shows, again, it's easy for one of skill in the art to do it. They can do it in mice. They can do it in humans, closely related genomes. In ReVec would suggest otherwise. That case says just because it can be done in one species doesn't give you a reasonable expectation in another species. And I want to focus heavily on the fact that the board found that this art is unpredictable. And there are statements in the record that in particular NK cell biology is unpredictable. I want to just say a comment briefly on a few things. Matthew does trouble me some here, because there is something about Matthews that suggests to me sort of a teaching away. And I think that's relevant to this question. But I do think that the example 12, the prophetic example in Valiente, is of some consequence here. And I do think that that shows an antibody probe specific for the gene of interest, correct? It shows the antibody. There are questions in Valiente raised about the specificity and whether that antibody actually could be used effectively in that prophetic example. I understand that. Your briefing seems to discount the fact that it's a prophetic example. But it's an example that is of consequence to the obviousness question, is it not? Well, I think it's something in the record that obviously the court needs to take a look at. But I don't think it dictates the result. I mean, there's no starting material. It doesn't matter that it's prophetic. It doesn't matter that it's prophetic. But I will say that one needs to look at everything that's disclosed in Valiente and what's not disclosed in Valiente. And the statements that question the reliability of the antibody need to be assessed in the whole question of whether there's a reasonable expectation. The fact that there was no NK cell library identified in Valiente is very important. Where does one start? Where do you have a reasonable expectation of success if you have no starting material? And when Matthew tells you, when you look with total NK cell RNA transcripts, it's not there. You can't find it. But you do have a starting material. You have a probe that binds to nail. So you can extract it and then you go through the Sandbrook libraries and find the sequence. Probe it in what? That's the question. You may have a probe. Valiente recognized that P38 is the key to NK activation. But you need a starting material from which to probe. And if you have an NK cell library that's not going to produce P38 or insufficient amounts, then you have nothing to prove. Valiente had already done that. Pardon me? It had already done that. It had produced P38s. It just hadn't sequenced them. Not for purposes of cloning. It had not done that for purposes of cloning. All it had done was taken some... What relevance is the fact that they had not done it for that particular purpose? Well, you need to be able to... You're looking for the DNA. You're not just looking for the protein. You're looking for the DNA. So you need a starting cell library that will have a sufficient amount of that particular gene that will produce that particular protein. But that's the sort of thing you assign to your lab assistant. You assign to the lab assistant to do it. And yes, it's trial and error. And yes, you make lots of mistakes. But remember, we've dealt with that in our case a lot. Atlas powder, for instance, you can have lots of mistakes and still produce it and fully enable your invention. But there's no reasonable expectation of success at getting to the final... The board disagrees with you. If that's a factual finding, they say, on the facts, it's routine in the art. One of skill in the art would know how to do it. But the board hasn't identified. I'm jumping to a different aspect of the claim. The board has not identified any basis for identifying the specific binding region, what the structure of that binding region is, and it hasn't identified any basis for finding CD48 binding obvious. And those are claim limitations that the board would consistently like to ignore or the PTO would like to consistently ignore. And those are important limitations that could not have been predicted from Valianti or any of the cited references or Sandbrook, which is really is not... Sandbrook does not contain a recitation of NK cell libraries. Sandbrook is just a general cloning... No, it tells the one of skill in the art how to produce those libraries. And when you've got the probe, that's not so hard to do. It does not tell one of skill in the art how to produce an NK cell library. And if you look at the methodology that's recited in the specification, what they used was a specific mixture of resting cells, resting NK cells, and NK cells stimulated with a very specific cocktail of activators. That's not disclosed in Sandbrook. That's not disclosed in Valianti. That's not disclosed anywhere. And nor is any of the CD48 binding aspects of this claim disclosed anywhere. And this is really getting down to the problem that we see with the board's analysis is looking at the methodology. And that's not the proper way. It's easy to say, sure, you know the end point. Could someone have used a hammer and a nail to get there? Could someone have used conventional tools to get there? That's a different question from, is this claim subject matter as a whole obvious from what came in the prior art? And looking at this invention, as it should be looked at, the genetic basis for the binding region for a very important interaction between nail and CD48, when that interaction was not known in the prior art and has significant biological consequences. Do you lose any way in the written description? No, Your Honor. We don't lose any way on the written description because here we have, in the written description context, we have what's claimed as a finite structural class, and within that class you also have the binding. Have you described all of the structures which fit within the 80% limitation? We've described them in terms of the 80% structural limitation and the ability to bind to CD48. And there should, in this instance, you're not dealing with, in some of the other cases that have been cited by the PTO, other cases are dealing with... You see, if you want to stick with your structure, structure, structure argument for obviousness, you've got to stick with it for your Lilly written description too, and you haven't described all those structures for Lilly. We've described a sufficient amount. We've described specific variants. You didn't describe any variants. You described one. Your Honor, our position is that the description of... And there is a vast amount of... Well, you can have different codons that recite for the same amino acid. The variances just at that level, not to mention the substitutable amino acids, gives you a vast amount of variation that you have to account for. But the specification has to be read from the vantage point of one of skill in the art. Oh, well, that's what we were just doing with obviousness, and you didn't want to give us much skill in the art there. Is there anything at all in the written description that discloses or suggests which parts of the amino acid sequence could be changed and still maintain the binding to CD48? Yes, Your Honor, and that's the discussion of conservative substitutions on A63. So there the concept of conservative substitutions is being mentioned, and that's a direct communication to one of skill in the art. Who would understand that when you make those conservative substitutions, you are retaining the binding function? And the conservative substitutions, there are even examples of those listed on A63, where it tells you you can substitute one aliphatic residue for another, such as, and it gives you lists of specific amino acids that can be substituted in that concept of substitution. And this is really just a shorthand way... Specific amino acids substituted in specific places and still retain the binding capability. The teaching here is that those amino acids can be substituted. The idea behind conservative substitution is that even in those binding regions, you can still have substitutions of amino acids that look like one another and still retain the function. So our position is that we have specific variants described here, not by a voluminous recitation of individual sequences, but in a shorthand language that one of skill in the art understands, that these are conservative substitutions that will retain binding. And that's how the specification needs to be looked at. It is interesting here that the board found that the enablement requirement was met. So there was enough of a teaching to satisfy that requirement, but somehow the written description requirement was not met. Well, I think it is significant that it is enabled. And I think that the written description requirement should be, as this court has repeatedly said, applied flexibly. And when you have a situation here where you have a finite structural class, unlike other cases, this is not a claim that is trying to capture unknown biological materials that might exist out there. This is a defined class within which you have a limited amount of variation, up to 20% variation, and an additional requirement that it binds CD48, where that testing and identification of those variants is fully enabled. Could I ask just one more question, back to the obviousness? I read your brief very closely. I don't think at any point it disputes that if one of skill in the art followed Valiente's example 12, they would get to exactly what Kubin is claiming. Is that right? No, Your Honor, that's not right. We have always made an issue at least of CD48. That is not taught anywhere. But CD48 is inherent. It is not inherent in what was disclosed in Valiente. There's no showing of inherency. There's no findings of fact that would support a finding of inherency with what is in that band on the gel or what you would get when you populate it. I think it's got to be an inherent property of what's taught by Valiente. Okay. If you do Valiente, you've got to have CD48. But how do you do Valiente? You don't have a starting material. And to satisfy inherency, you've got to have the inevitability test. CD48 must bind to nail to activate the NK cells. It must. But you don't. That's the science. Well, it must if you have the binding region. And what's in that gel, there's no evidence that that retained the binding region. Column 5, line 6 of Valiente. Stimulation of P38 results in activation of cytotoxicity. That's stimulation by the antibody. It is entirely possible for a protein to have different binding sites, one to the antibody and one to the CD48. So the fact that the antibody is binding tells you nothing about CD48. That's a completely unknown interaction. And it is important that there are no starting materials because you cannot say, especially when you take the teachings of Matthew, who teaches you that if you look at total RNA transcripts from NK cells, you're not going to find it. You cannot say that no matter what you use as your starting material, you're going to get the cDNA for now. Excuse me. Just to ask a variation of Judge Rader's question, assume hypothetically the claim did not contain that last recitation with regard to binding to CD48. Would you agree with me that Valiente and the prophetic example 12 would lead one of ordinary skill in the art to the claimed sequence? No, I wouldn't. Again, because of the starting material issue and the unpredictability in the art. You're still having the problem of not knowing how to really apply Valiente. Mr. Rudolph, thank you very much. You've been very helpful to the court. We're going to restore your full five minutes, actually give you an additional couple. So she'll have five minutes plus the four she went over. Would you give nine additional minutes to Ms. Gongola if she needs to use it? Thank you, Ms. Rudolph. Just one second while our clock catches up with my instructions. Good. We'll give you ten extra minutes. No, that's fine. Ms. Rudolph will have a little extra time beyond her rebuttal time as well. Please proceed. Thank you. Good morning. May it please the court. The board correctly found that Kubin's claimed genus would not have been patentable for two reasons. Because it was obvious in view of the combination of Valiente and Sandbrook, and independently because it lacks written descriptions. Yeah, but I started Ms. Rudolph with O'Farrell. I'm going to start you with Duell. If we look at biotechnology as requiring structure, structure, structure, as chemical inventions do, don't you lose? No, Your Honor, we do not. Our fact pattern is distinct from the fact pattern in Duell. In Duell, the court explained that the identification of a structurally similar molecule in the prior art is normally where you would start to make a chemical obviousness finding. Normally, that word is key because that means it's just descriptive of one way that you can establish chemical obviousness. It's not prescriptive in that you always have to do it that way. And in this case, our fact pattern is different than Duell. The prior art in Duell did not teach an obvious species falling within the scope of the genus. The prior art taught a protein, a partial sequence for a protein, and a general method of making it. Yes, but you're trying to distinguish. If I follow the rule of Duell, it says general methodologies are irrelevant. You lose Sandbrook, and if you don't have Sandbrook, you can't have the libraries, and you can't use Example 12 to get to Cuban, can you? Respectfully, Your Honor, I disagree with that. Duell goes on to contrast general methodologies for making an undefined cDNA molecule. The court there said that it was irrelevant to whether a specific molecule would have been obvious. In the very next sentence, the court explains what to do with a specific method, and the court said, A prior art disclosure of a process reciting a particular compound is another matter, raising issues of anticipation and obviousness. We are that other matter. What the board did here is it looked to the teaching of Valianti. Valianti identified p38 cDNA, gave a motivation to make it, and then provided a methodology for doing so. So Duell envisions the situation we have here and says the result would be different. We have a specific method teaching how to make a specific DNA molecule falling within the scope of the genus. Ms. Rudolph questions the fact that there is no library shown in Valianti. What is your response to that? If you listen to what Ms. Rudolph actually said, she explained to you that example 12 did identify starting materials, a specific kind of NK cell library that a person of skill in the art would have known to use. This kind of goes to the question of reasonable expectation of success. Mathews provides that reasonable expectation of success. Mathews followed the method of Valianti identically, except using mouse NK cells instead of human as a starting material, and instead of using a probe specific for human p38 cDNA, Mathews used one for 2b4 cDNA. But Mathews successfully followed the method otherwise and obtained 2b4 cDNA, the mouse counterpart to human male. So the board made specific findings in this regard at page A9 of its decision. It explained that Mathews is cumulative to Valianti and provides the reasonable expectation of success. Kubin itself, before the board, and the board made this finding at finding of fact 13, admits that conventional cloning methodologies were known in the art. People knew how to clone. The board capitalized on this, found that Valianti taught a prior art species, that species was obvious in light of the methods used to make it, and then in turn said the prior art disclosure of an obvious species under the line of lily renders the claimed genus obvious. Is the rejection in any way vulnerable because of the failure of a specific teaching with regard to cD48? No, Your Honor.  At finding of fact number 1, the board found that Valianti teaches the protein. The protein inherently binds cD48. Kubin can't dispute that. Kubin says that was their finding. Therefore, finding of fact number 1 is implicitly contemplating not only the protein being taught in the prior art, but all functions of the protein, including cD48. So the board did consider the invention as a whole. That's not a problem for the obviousness analysis. Dual. Is it consistent with KSR? Yes, Your Honor, except for one small feature of KSR. Dual, people have cited dual. You don't seem to, the board doesn't seem to agree with you. No, respectfully, I would disagree with that characterization. The board explained, if we look at page 88 of their decision, they don't say that KSR overturns dual or anything along those lines. The board pointed out that KSR may cast doubt on dual to the extent that the Federal Circuit has rejected an obvious to try test. In KSR, the Supreme Court said that in certain circumstances, obvious to try may be the standard for obviousness. And that's what the board was saying here. That to the extent people are citing dual for the proposition, obvious to try can't be the standard. Well, KSR cast doubt on that. But otherwise, dual remains good law for the standard. Well, KSR said rather persuasively on page 12 here that it might have been obvious to try the combination of Asano. And our big mistake, of course, was rejecting Asano. Because obvious to try, and they cite dual for the mistaken methodology of not trying the combination of Asano. Doesn't that cast a little doubt on dual? Only to the extent that dual says obvious to try can't be the standard. I think the Supreme Court went on to clarify that when there's a design need or a market identifies a problem, and there's a finite number of identified solutions, and those solutions are predictable, then obvious to try can be the standard. And the board here applied that principle in an alternative fashion. So we've got the obvious species grounds, and we have a separate obvious to try ground for finding the reason why Kubin's claimed invention would have been obvious. Here, the board said that the problem was to identify or isolate male cDNA. There were a limited number of methodologies to do so, and a person of skill in the art would have followed those methodologies and met with success. The board was correct. Valianti teaches one and only one method for isolating p38 cDNA. Matthews comes along and provides the reasonable expectation of success, showing, hey, they followed that same method, and they obtained 2B4 cDNA. Of course, the commentary of the Supreme Court in KSR with regard to obvious to try was in the context of a very simple mechanical invention, and it's easy to see a finite number of solutions in that context. Does that have any real relevance to biotechnology, which I think very few people would characterize almost anything in biotechnology as having a finite number of simple solutions. Almost everything is complex with unpredictable solutions. So in that sense, is Duell's view of obvious to try still valid? I don't think so. Nothing in KSR said that its discussion of obvious to try was limited to a mechanical art or a simple technology. In fact, we know this expressly because the Supreme Court in KSR said that following the principles announced in that case in KSR might not be as easy in other cases. All inventions, and these are the Supreme Court's words, don't involve a simple substitution of one known element for another or the application of a technique to a piece of prior art to arrive at an improvement. So the Supreme Court was contemplating applying KSR beyond a mechanical combination of two parts to the biotechnology arts. I think Takeda also helps us in this case because there, Alpha Farm made an argument on an obvious to try in a biotechnology case. This court entertained that argument but rejected it. There, Alpha Farm was making the argument that there was a genus of compounds being claimed. And Alpha Farm said, well, this lead compound called compound B would have satisfied the obvious to try test. A person of skill in the art would have selected that compound. It represented the limited number of methodologies. This court said, no, it didn't, because the prior art there taught hundreds of compounds. Nothing singled out the compound B. And on top of that, the court noted the prior art actually would have taught away from using compound B as an anti-diabetic because it had some negative properties. Well, our facts stand in direct contrast to those facts in N. Takeda. Here, where we have a limited number of methodologies, we have one method being taught by Valianti's example 12. And Matthew's evidence is the expectation of success. So this is a classic case to apply obvious to try in an unpredictable art and to demonstrate it will work. That's what the board meant at pages 8, 8, and 9 of its decision when it applied obvious to try to these facts. One of the other areas I wanted to mention is— Mr. Gongo, before you leave that, can I ask you something? I'm going to read a sentence from the Lilly amicus brief. The board's radical deviation from this court's well-settled precedent on chemical structural obviousness will, if not reverse, unbalance the careful calculus of risk and investment in the pharmaceutical industry to the detriment of patients. The point I'm going to focus you on is chemical structural obviousness. Is there a distinction between the standards we ought to use for chemical structural obviousness and the code-based art of biotechnology, which probably has more in common with computer technology than chemistry? Is there a distinction there? No, Your Honor, but in this case we're not dealing— In another case, maybe yes, but not here. Our prior art would lead one of the skill in the art to start with Valianti. Practice example 12 of Valianti produced P38c DNA. We know this because the standard for chemical obviousness—Duhl didn't create it. The standard goes back years before Duhl. It goes back to Bell. This is not a case where the board is trying to overturn the standard for chemical obviousness. The amici seem to say that— Well, you're not dealing with chemical structural obviousness, are you? You're dealing with biotechnology. Isn't there a distinction? No, Your Honor. Biotechnology compounds are chemical compounds, so there is no difference. We're not trying to overturn Duhl. We think that Duhl remains good law with respect to the standard for chemical obviousness. It's the Patent Office's position, as the board explained in its decision, Duhl is distinguishable and therefore not controlling here. One of the positions that Counsel for Kubin took is she said, Well, we don't know that the antibody won't work. Well, I'd like to talk about that for just a moment. The portion of Valianti that Counsel for Kubin cites is talking not about the antibody won't work. It's discussing cells that do not express any P38. So if there's no P38 present in the cells, then the antibody is not going to bind to any P38. That's why, in her view, the antibody won't work. But it's not that it doesn't work. It's that the cells will not express the antibody. The other area—I'd like to move now, if the Court has no more questions on obviousness, into the written description area. This Court found that written description was not satisfied under the only two tests that Kubin ever raised before the board, the representative number of species test and the structure function correlation test. Now, the board found, at finding a fact 20 and 21, that the specification only taught how to make cDNA molecules that, in code, nail identically. That's one subgenus. The board found, at finding a fact 22, that the specification did not teach anything about any variants. What about the conservative substitution set forth at A63? The language on conservative substitution, using the board's own findings, does not demonstrate, finding a fact 23, which 20 percent of the amino acid residues should be changed to maintain function. So that discussion of conservative substitution may teach how to make the variants, but it doesn't teach what those variants are. It doesn't describe them so that a person of skill in the art would understand that Kubin possessed the variants. The board, finding a fact 25, says that there are a very large number of modifications that can be made. One in five amino acids can vary. We have no idea which of the 22 to 221 portion of male to change and maintain binding, which amino acids have to remain and which can be substituted. But more than that, even if this court would accept the discussion that the conservative substitution could somehow provide written description support for variants, it wouldn't still do so for the full scope of the genus. That discussion would only apply to variants made by substitution. Kubin has defined a variant to be made by a substitution, an insertion, or a deletion. Conservative substitution dialogue doesn't speak to anything about variants made by insertions or variants made by deletions. So therefore, applicant Alonzo still has... Yes, but the description of the variations is also linked to a protein having activity Y. Therefore, this satisfies the function structure alternative test for written description, doesn't it? No, Your Honor. The function structure test requires an identification of a structure common to all members of the genus. We do not have that identification of a common structure. I'm floating almost out of PTO's manual on written description verbatim when I give my example there, am I not? The variations plus the activity Y, protein having activity Y, isn't that exactly the PTO's manual on written description? Are you referring to the training materials? Yes, I am. That language may be found in the training materials, but it's guidance. Each case of written description has to be decided on its own facts. The Patent Office is guiding applicants on how to do things wrong? No, Your Honor, but guidance provided in a training document cannot be taken and applied to each case. Each case has to be decided on its own facts. So it's just guidance to examiners on how to do it wrong? No, Your Honor, respectfully, it is guidance to the public as well. But if we take that guidance, we don't get to your result, do we? No, Your Honor, I respectfully disagree. We do. In Carnegie-Mellon, this Court has explained that when there's substantial variation within a genus, an applicant has to describe a sufficient number of species to reflect the variation. Kubin has not done that here. Kubin hasn't described any variation. If we want to look at the training materials, the Board... It's interesting that this was revised immediately after Kubin, the Kubin result, wasn't it? The... Which is kind of an admission that the example did track Kubin and was detrimental to your position, wasn't it? No, Your Honor. So despite your smiling defense, the facts tend to give us a different conclusion. No, Your Honor, that's not correct. The training materials were not revised post-Kubin to somehow capture Kubin. The revisions have been in the works for a very long time. I see. Okay. So it's just coincidence that example 11 may seem to look like the Kubin fact pattern. But if we actually look at example 11, it is distinguishable from the facts here. Example 11 goes to an acrylic acid that encodes a polypeptide that has a certain homology, 85% homology, in a certain activity. Now here's where... That sounds a lot like Kubin's claim. I agree with that. But here's where the difference resides. The specification in example 11 disclosed two specific domains that were responsible for the activity. Kubin's specification here doesn't contain any similar disclosure. So the fact pattern here is different from the fact pattern in the revised training materials. But I also want to note these materials, as you point out, were not even in existence when the Board rendered its decision. So it really isn't proper to be considering them right now since the Board didn't have a chance to consider them in the first instance. And on top of that, they're only guidance. They are not a rigid rule. I'd like to take you back to obviousness for a minute. With respect to Matthews, it seems to me that there's at least an argument, and certainly Kubin makes the argument, that Matthews points away from any connection with Valianti by suggesting that while there is some human counterpart gene to the murine 2b4, that it's not expressed in humans, and that that teaches away and should have been considered in the obviousness analysis. What are your comments to that? I have two comments. First, the Board did consider Matthews and did consider this conflicting language. The Board said that that only shows that there's conflicting evidence regarding the existence of a human homologue. It doesn't show that Matthews would teach away from a person of skill in the art using Matthews in combination, not that this is what the Board did, but looking at Matthews for an evidence of a reasonable expectation of success. And at the same time that the reference questions whether the human homologue is expressed, the reference also teaches at A933 is where it explains that maybe the human homologue is not expressed. A couple pages later, at 935, the reference teaches that the mouse 2b4 is conserved during evolution. So that suggests the opposite. So if anything, I think we can look at Matthews as sort of a challenge for a person of skill in the art to establish does or does not a human homologue exist. But it certainly isn't a discouragement, those are the words of teaching away law, for someone to look at Matthews only for a teaching of a reasonable expectation of success. Thank you. If this Court has no further questions, it is the Patent Office's position that substantial evidence supports the Board's findings of fact both on obviousness and written description and its findings of conclusions of law on obviousness are correct. We ask this Court to affirm on both grounds. Thank you. Thank you, Ms. Congola. Ms. Rudolph, you have six minutes remaining. What's interesting about the counsel for the PTO is that she hardly ever mentioned CD48 in the obviousness discussion. And when she did, it was only to discuss inherency. And we discussed inherency a little bit before, but one point I wanted to make sure I brought out was the legal aspect of inherency for obviousness. It's our position that if there's a claim limitation that is going to be looked at under a theory of inherency, there has to be recognition of that inherent aspect in the prior art for that to be something that can be counted against the claim in the obviousness determination. Why? If it's inherent, isn't that enough? Why does it have to be recognized in the prior art to be inherent? Because obviousness is viewed from the perspective of one of skill in the art, unlike anticipation. And you're not dealing with something that existed in the prior art. You're dealing with something that is argued to be, and obviously we don't say it is, but is argued to be obvious from what came before in the prior art. And those unexpected results or unpredictable aspects or inherent properties that one could not have predicted need to be taken into account in the obviousness calculus, and those should weigh on the side of non-obviousness. If inherent properties were not to be looked at at all, then unexpected results could never be an issue in the obviousness determination. And the Supreme Court has said that that's important evidence to look at for non-obviousness. But if binding with CD 48 necessarily occurs in every case, the standard for inherency, what difference does it make whether somebody expected it or recognized it or even thought about it? Well, again, if it's an unexpected result, then if you're dealing again with an obviousness case, not an anticipation case, then it does make a difference. But I also want to point out that we are disputing whether what was disclosed in Valiantis would necessarily... How can it be an unexpected result if it is the only result and one of skill in the art will know that it is the only result? It's the thing that binds. But there's no basis in this record for what it would bind to. NK cell technology or NK cell biology is extremely complex. And we've cited two specific portions of the record that make that clear. This is very complicated business. And there are a whole host of proteins and substances that can interact with NK cells. And some of them have been identified. CD 48 was not. And there are statements in the record that say, boy, this biology is complicated. We don't know the basis yet for this activation. And it's possible that NK cell activation could occur on multiple pathways. There's no mention of CD 48 and that interaction whatsoever in the record. That's a completely unexpected result, unpredictable result. And it's a claim limitation. So the board was not entitled to simply ignore that claim limitation when assessing obviousness. The other point I want to make is that counsel for the PTO mentioned that Valiente did not or identified cDNA for P38. They did not. What Valiente did was no more than what Dual did, except for they combined the references into one reference. In other words, in Dual you had more than what we have. Bolin and moniotis. Right, the Bolin protein had at least a partial amino acid sequence in it. There's nothing of this sort. 19N sequence portions. There's nothing of this sort in this record. There's no partial amino acid sequence. And they combined it with the moniotis reference, which is some general cloning techniques. Valiente just basically put those two pieces together into one reference, but it's no more. Prophetic example 12 is just sort of a cookbook general cloning method with no starting material and no reasonable expectation of success. And certainly no indication of what is the binding region, what is its structure, and what is the genetic basis that encodes for that binding region. So the facts that are at play in this case are very different from Dual and counsel in favor of non-obviousness, not obviousness. So even if we had a Dual situation, Dual should still control. But we have beyond that. We have facts that really go beyond it and prove how unobvious this claimed invention actually is. Turning to Matthew quickly, the board and the PTO keep saying that Matthew was the mouse counterpart for P38. It's the mouse counterpart. That was not recognized in the prior art. So to the extent that the board is relying on, oh, you can have a reasonable expectation because this was a similar protein. But doesn't Matthew show that the method works, that it does isolate the gene in the mouse, and it also provides a motivation to do the same thing to obtain the human homologue? What Matthew shows is that you can get, using the materials and the specific methods, starting with mouse cells, you can get that mouse protein. There's nothing that would connect that up to P38. And it says you can probably do the same thing in humans, right? It says you can. I mean, it says that if you look at what Matthew showed, they tried to find the counterpart in humans. What they found was a region of the genome that was a homologue. A region of the genome that was a homologue. A lot of the human genome is not expressed. So the second finding was there's a homologue, but it doesn't look like it's expressed. So what is that telling you? That's telling you if there's anything with Matthew that you would not expect to find that same thing in the humans. It's a teaching away. I see my time has expired. Does the court have any further questions? No, the court has not made your job easy today, but you have magnificently represented your client and helped the court. Thank you very much.